**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **RICARDO SALINAS, JR.,** | CASE NO. 3:24 CV 1347 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **JACOB D. BOMBRYS,** | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

Pending before the Court is Defendant Detective Jacob D. Bombrys's Motion for Summary Judgment (Doc. 33) on Plaintiff Ricardo Salinas Jr.'s excessive force claim under the Fourth Amendment and 42 U.S.C. § 1983—the sole remaining claim in this case.[1] Plaintiff opposed (Doc. 36), and Defendant replied (Doc. 39). Jurisdiction is proper pursuant to 28 U.S.C. § 1331. For the reasons set forth below, the Court denies Defendant's Motion.

## BACKGROUND

In the early morning hours of August 7, 2022, Officers with the Toledo Police Department ("TPD") responded to a report of a fight at "Goody's," a bar at which Plaintiff was a patron. *See* Defendant Dep., Doc. 31-2, at 90. The responding Officers' body-worn cameras captured the events relevant to this dispute. *See* Docs. 31, 34, 37 (providing notice of Defendant's manual filing of bodycam footage from Officers Bombrys, Humason, Simpson, and Billinghurst).[2] As Officers

---

1. While Plaintiff originally brought his excessive force claim against multiple TPD Officers, *see generally* Doc. 1, his Amended Complaint asserts such claim against Defendant Bombrys only, *see* Doc. 21, at 5–6.
2. Hereinafter, the Court will refer to bodycam footage according to the officer who captured it and the appropriate timestamp, e.g., "Humason Bodycam, #:##."

initially arrived, numerous patrons can be seen standing in what appears to be the bar's front parking lot. *See* Simpson Bodycam, 1:50–2:10. While securing the scene, a loud noise causes Officer Simpson to radio "shots fired." *Id.* at 2:18–:20. Simpson then runs to the rear of the building, encounters numerous additional patrons, and orders them all to the ground. *Id.* at 2:26–:45. Plaintiff was one such patron. *See* Plaintiff Dep., Doc. 31-1, at 27.

While Simpson secures the scene, these patrons, now lying prone in an additional parking area, advise Simpson the man with the gun is running in a different direction, and that officers "have the wrong . . . people." (Simpson Bodycam, 3:05–:14). Around the same time, Defendant arrives to the front of the bar's exterior, where patrons advise him a woman is having a seizure on the ground. *See* Defendant Bodycam, 3:10–:23. Defendant then moves to the bar's rear, where the patrons Officer Simpson previously ordered to the ground continue to claim they are not the shooting suspect. *Id.* at 3:25–:47. While waiting for more officers to arrive, Defendant directs other officers to cover various areas of the scene and to start patting down patrons. *Id.* at 4:40–:53. A short time after, Defendant moves to handcuff one of the prone patrons and accuses him of having a firearm. *Id.* at 5:55–6:26. After a brief search, Defendant does not locate a firearm. *Id.* at 6:26–:55.

Around this same time, Officer Billinghurst arrives. *See* Billinghurst Bodycam, at 3:25–31. From her vantage point, Defendant can be seen conducting the aforementioned search for the firearm. *See id.* at 3:45–:55. He then points at another prone patron and states "I'm done with you, you're going" before handcuffing him. *See id.* at 3:55–4:03; Defendant Bodycam, 7:05–:10. While Defendant effectuates this arrest, Plaintiff, while lying prone immediately adjacent to Officer Billinghurst, slings expletives in Defendant's direction. *See* Billinghurst Bodycam, 4:05–:07.[3]

3. Plaintiff testified he observed an officer "kick one of [his] buddies in the face on the ground" prior to his arrest. (Plaintiff Dep., Doc. 31-1, at 28). The bodycam footage depicts no such kick.

Officer Billinghurst instructs Plaintiff to "stop it" and asks, "Do you want to go too?" *Id.* at 4:07–:10. After another brief exchange not clearly captured by the video's audio, Billinghurst then places Plaintiff in handcuffs without incident or resistance, with assistance from recently-arriving Officer Humason. *See id.* at 4:10–:20; Humason Bodycam, 4:05–:42. As depicted by Humason's bodycam, Billinghurst gets Plaintiff off the ground and begins escorting him towards a police vehicle. *Id.* at 4:43–:45.

Despite the presence of clear bodycam footage, the Parties and relevant witnesses dispute what happens next. Billinghurst testified Plaintiff was "being difficult to walk with" and "at one point . . . stop[ped] walking completely" such that Billinghurst had "to push into him to continue moving him." (Billinghurst Dep., Doc. 31-4, at 25). Plaintiff makes no mention of such a struggle, testifying only that he was "escorted to the car" and "put on the car." (Plaintiff Dep., Doc. 31-1, at 28); *see also* Doc. 36, at 7 (describing Officer Humason's bodycam footage as "demonstrat[ing] that Plaintiff never stopped walking with Officer Billinghurst but did continue to express his frustration about the situation"). The relevant footage does not clearly support either account. At one point, Plaintiff can be seen turning his head to speak to Officer Billinghurst, as Billinghurst forcefully orders Plaintiff to "go." (Humason Bodycam, 5:02–:07). However, at no point does Plaintiff clearly plant his feet, thrash, stop walking entirely, or otherwise cease moving towards the vehicle. *See id.* at 4:55–5:09.

While adjacent to a police vehicle, Billinghurst then puts her arm around Plaintiff's neck and places him against the vehicle. *See id.* at 5:07–5:10. After escorting his own arrestee towards a separate police vehicle, Defendant joins Billinghurst in placing Plaintiff against the vehicle. (Defendant Bodycam, 8:15–:18); (Defendant Dep., Doc. 31-2, at 49).[4]

---

4. As he attempts to secure Plaintiff against the vehicle, Defendant's bodycam is knocked to the ground. *See* Defendant Bodycam, at 8:18–:21.

Once Plaintiff is pressed against the police vehicle, Defendant can be heard stating to Plaintiff "knock it off" and "you're going." (Humason Bodycam, 5:12–:18). After, Defendant and Officer Billinghurst begin to walk Plaintiff towards a separate squad car, with Defendant holding Plaintiff's right arm and Billinghurst holding Plaintiff's left. *See id.* at 5:18–:20. Again, despite the presence of the bodycam footage, the Parties at least initially disputed what occurs next. Defendant testified he could not be sure whether he intentionally took Plaintiff to the ground or whether Plaintiff's alleged active resistance caused the pair to trip and then go to the ground. *See* Defendant Dep., Doc. 31-2, at 50–51. Plaintiff avers he struggled to keep his balance while being "drug" by officers of different heights, causing him to struggle to "keep up with [his] steps to even keep up with [the Officers]." (Plaintiff Dep., Doc. 31-1, at 28–29). On his account, Plaintiff was then "slammed" to the ground. *Id.* at 28.[5]

Irrespective of this initial dispute, Defendant assumes for the purposes of his Motion that "there was an intentional use of force" in bringing Plaintiff to the ground. (Doc. 33, at 6). This is a safe assumption, as Officer Humason's bodycam footage depicts Defendant swinging his left foot out in front of Plaintiff's walking path, planting this foot, causing Plaintiff to trip, and then placing his body weight on top of Plaintiff as both go to the ground. *See* Humason Bodycam, 5:20–:27. This intentional takedown takes place no more than five seconds after Defendant and Officer Billinghurst began to escort Plaintiff from one police vehicle to the next. *See id.* at 5:18–:24. Only after taking Plaintiff to the ground does Defendant advise him to stop resisting. *See id.* at 5:24–:32.

---

5. Plaintiff's account is supported by a supplemental report authored by one Officer Marquis. *See* Doc. 31-2, at 90 ("On the way to the vehicle, a takedown technique was utilized by Officer Bombrys to maintain control of Salinas.").

Plaintiff's head struck the ground during the takedown, causing a severe laceration to his forehead. *See id.* at 7:00–:05; Plaintiff Dep., Doc. 31-1, at 30–32. The fire department eventually treated this injury with a bandage, after which Plaintiff was transported to the hospital in the back of a police cruiser for further treatment. (Plaintiff Dep., Doc. 31-1, at 30–32).[6] This lawsuit followed.

## Standard of Review

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record

6. While at the hospital, Plaintiff was notified his blood alcohol levels were "high." (Plaintiff Dep., Doc. 31-1, at 71). Plaintiff stated he consumed "two mixed drinks and two beers" before TPD Officers arrived at the bar, *id.* at 24–25, and admitted he was also under the influence of marijuana, *see id.* at 58–59.

upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## Discussion

Defendant argues he is entitled to summary judgment for two independent reasons. First, he contends he did not employ excessive force in violation of the Fourth Amendment as a matter of law. *See* Doc. 33, at 7–10. Next, Defendant argues he is entitled to qualified immunity as, even if questions of fact remain regarding the presence of a Fourth Amendment violation, any such violation does not offend Plaintiff's clearly established rights. *See id.* at 10–13. Qualified immunity "spares officers from 'the time, expense and risk of money-damages actions' unless they violate clearly established constitutional rights.'" *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quoting *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012)). Unlike other affirmative defenses, a plaintiff bears the burden of overcoming qualified immunity once any defendant raises it. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). To do so, a plaintiff must demonstrate: (1) the officers violated the plaintiff's constitutional right; and (2) the violated right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court retains discretion to address each element in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

<u>Constitutional Violation</u>

Beginning with the first qualified immunity prong, the Court finds disputes of fact preclude summary judgment on the question of whether Defendant violated Plaintiff's Fourth Amendment rights. Under the Fourth Amendment test for excessive force, the "operative question is whether the force used was '"objectively reasonable" in light of the facts and circumstances confronting' the officer." *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Under this objective reasonability test, multiple factors are relevant,

including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "Importantly, the inquiry is not whether *any* force was justified, but whether the officer could reasonably use the *degree* of force that was employed." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022) (citation modified).

Defendant contends the first *Graham* factor weighs in his favor because "the police were actively investigating a report of gunfire as Plaintiff's arrest unfolded" and, while Plaintiff himself was no longer suspected of the shooting, "it was essential for officers to get him into the patrol car and return to their investigation as quickly as possible." (Doc. 33, at 8–9); (Doc. 39, at 5). As explained by another Judge of this Court, "the severity of the crime does not, by itself, justify greater levels of force when the suspect is no longer in a position to continue the crime." *Ellis v. Timm*, 504 F. Supp. 3d 726, 736 (N.D. Ohio 2020). Rather, the severity of the crime at issue is only relevant to the *Graham* analysis when "the level of force the officers used" promotes either (1) the state's interest in preventing further commission of the crime—here, misconduct at an emergency—and thereby protecting the public, or (2) its interest in prosecuting the individual committing the offense. *See id.*; Plaintiff Dep., Doc. 31-1, at 77–78. In this sense, a crime of greater severity provides officers with greater leeway to use physical force because their interest in preventing the crime's continued commission and protecting the public is necessarily heightened.

However, as discussed further *infra*, genuine factual disputes exist regarding whether Plaintiff actively resisted Defendant and Officer Billinghurst as they attempted to escort him to another police vehicle. Before the takedown, the video depicts Plaintiff moving with the Officers towards another squad car. *See* Humason Bodycam, 5:18–:23. If he did not offer active resistance during this period, then performing a takedown and halting Plaintiff's movement towards the police vehicle would *harm* the Defendant's stated interest in quickly securing the scene of an active

shooting. Thus, while "respond[ing] to an emergency call" of shots fired is undoubtedly a serious situation involving a severe offense, which an individual's unruly conduct may "exacerbate[]," *Shumate v. City of Adrian*, 44 F.4th 427, 442 (6th Cir. 2022), the evidence before the Court does not conclusively demonstrate Defendant's takedown of Plaintiff in any way promoted the state's interest in responding to this emergency or subduing those responsible for creating it. Plaintiff was already handcuffed and subject to arrest at the time Defendant took him to the ground, and Defendant does not argue Plaintiff presented a flight risk. For the moment, this factor cuts in favor of neither Party.[7]

Next, Defendant does not meaningfully contend Plaintiff presented an immediate threat to TPD Officers or the public. Instead, Defendant offers only a cursory invocation of Plaintiff's intoxicated status and case law holding "heavy intoxication can create a volatile situation." (Doc. 33, at 9) (quoting *Stanfield v. City of Lima*, 727 F. App'x 841, 846 (6th Cir. 2018)) (citation modified). True, "[d]runk persons are generally unpredictable" and may pose a heightened threat to the safety of police officers or the public. *See Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007). However, *Stanfield* itself clarified that, while a suspect's heavy intoxication may provide an independent basis on which to handcuff them, "the reasonableness of the force used to effectuate the seizure . . . will generally depend on other circumstances, such as the individual's *resistance* and *hostility*." 727 F. App'x at 846 (quoting *Solovy v. Morabito*, 375 F. App'x 521, 524 n.4 (6th Cir. 2010)). In other words, once a suspect is in handcuffs, their intoxicated status does not itself provide a basis on which to believe they pose a threat to officer or public safety absent additional indicia of resistance, violence, or hostility.

---

7. As discussed further below, a reasonable jury could believe Plaintiff's testimony he did not actively resist Defendant and Officer Billinghurst's efforts to escort him. If the jury so chooses, then effectuating a takedown maneuver would in no way promote the state's interest in preventing further commission of the crime of "misconduct at an emergency."

The main thrust of Defendant's argument is that Plaintiff "actively resisted" him and other TPD Officers when they attempted to arrest and escort him to a police vehicle. *See* Doc. 33, at 9–10. The line between active and mere passive resistance is often a fine one. *See, e.g.*, *Feagin v. Mansfield Police Dep't.*, 155 F.4th 595, 604 (6th Cir. 2025) (recognizing a "zone of twilight" between active and passive resistance in which officers are given the benefit of the doubt). Generally, active resistance includes, but is not limited to, "physically struggling with the police, threatening them, resisting handcuffs, or acting erratically." *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1168 (6th Cir. 2025); *Roell v. Hamilton Cnty.*, 870 F.3d 471, 482–83 (6th Cir. 2017) (explaining an arrestee kicking, flailing, and wriggling away from an arresting officer constitutes active resistance when the arrestee is not in handcuffs). At its core, active resistance involves "some outward manifestation—either verbal or physical—on the part of the suspect [suggesting] volitional and conscious defiance" of an officer's commands or attempts to subdue the suspect. *Eldridge v. City of Warren*, 533 F. App'x 529, 533–34 (6th Cir. 2013). Passive resistance, on the other hand, involves non-violently failing to comply with orders, such as "failing to exit a vehicle," and will typically not justify substantial physical force. *Moore*, 126 F.4th at 1168 (quoting *Browning v. Edmonson Cnty.*, 18 F.4th 516, 527 (6th Cir. 2021)). Further, insulting language, "verbal jabs[,] and rude hand gestures [are] not threatening in a manner that would amount to active resistance absent something more, such as overtly threatening language." *Shumate*, 44 F.4th at 448; *see Wells v. City of Dearborn Heights*, 538 F. App'x 631, 638 (6th Cir. 2013) (holding a handcuffed suspect lifting his head to turn and face officers did not constitute active resistance, even where the suspect was swearing at officers).

Here, disputes of fact preclude determining whether Plaintiff actively resisted officers and, accordingly, whether Defendant's takedown of Plaintiff constituted excessive force under the Fourth Amendment. Primarily, this dispute centers around whether Plaintiff was using his weight

to resist TPD Officers' efforts to escort him to a police vehicle after handcuffing him. Importantly, the Court need not limit its analysis to any resistance Plaintiff offered in those few seconds leading up to Defendant's use of force. *See Feagin*, 155 F.4th at 611 (recognizing the Supreme Court's decision in *Barnes v. Felix*, 605 U.S. 73 (2025) barred Fourth Amendment analyses which focused on just the "climactic moment" in which force was used). Thus, it is proper for the Court to consider any resistance Plaintiff offered Officer Billinghurst which, if observed by Defendant, would impact the force a reasonable officer in Defendant's position would perceive as necessary.

Moving chronologically, there is no dispute Plaintiff complied with Officer Billinghurst's initial handcuffing. *See* Billinghurst Dep., Doc. 31-4, at 24. Next, Defendant first contends he saw Plaintiff "pushing back against [Officer Billinghurst] as she was attempting to walk him towards the patrol vehicle." (Defendant Dep., Doc. 31-2, at 49). Defendant's bodycam footage is consistent with this account, as he turns to face Officer Billinghurst and, behind her, Officer Humason, as the former escorts Plaintiff towards a police vehicle while instructing Plaintiff to "go." *See* Defendant Bodycam, 8:14–:17. Officer Billinghurst also offered deposition testimony as to Plaintiff's resistance, stating he was being difficult to walk with and "stop[ped] walking entirely" by "plant[ing] both feet," requiring Billinghurst to "push into him to continue moving him." (Billinghurst Dep., Doc. 31-4, at 25). Plaintiff, contrarily, maintains he was "walking normally" towards the squad car when being escorted by Officer Billinghurst. *See* Plaintiff Dep., Doc. 31-1, at 63 ("Q: Do you think you were walking normally when just [Officer Billinghurst] was walking with you?" A: For what I could as she was pulling me along, yes.").

After Defendant joined Officer Billinghurst in the attempt to escort Plaintiff towards another police vehicle, he states Plaintiff "resist[ed] actively against [them] and [was] not allowing [them] to just walk freely with him" and further claimed Plaintiff "continually pushed against

[them] and pulled away from [them], causing [them] to tangle feet." (Defendant Dep., Doc. 31-2, at 50–51). Officer Billinghurst was more measured in her recounting of this interaction:

> I'm on [Plaintiff's] left side. Officer Bombrys is on his right side, and we start walking with better control. I, again, have my arm hooked up in between. I think my hand might be up to his shoulder. And then he got - - he went to the ground. I did - - he was just pulled from my arm. . . . When he went to the ground, I - - he was not in my arms anymore. I kind of got pulled with them, but I didn't go to the ground.

(Billinghurst Dep., Doc. 31-4, at 25–26). Again, Plaintiff maintains he was not at fault for the fall, as he was being "drug" or "pulled" by the Officers, each of whom was moving at a different speed, before being "slammed" into the ground. *See* Plaintiff Dep., Doc. 31-1, at 28–29. With respect to the entire escort process—from Billinghurst escorting Plaintiff by herself, to Defendant assisting in placing Plaintiff against the first police vehicle and attempting to assist in escorting him to the next—the proffered bodycam footage is indeterminate.

As recounted above, at no point does the video depict Plaintiff clearly planting his feet, refusing to walk, or otherwise offer demonstrating signs of "physical struggle" consistent with active resistance. *See Moore*, 126 F.4th at 1168. At one point, Plaintiff appears to stumble or shift his weight to the left while being escorted by Officer Billinghurst, *see* Humason Bodycam, at 5:44–:48, but such movement is equally consistent with Plaintiff losing balance after being "pull[ed]" by Officer Billinghurst, particularly where it is undisputed Plaintiff was under the influence of drugs and alcohol. *See* Plaintiff Dep., Doc. 31-1, at 24–25, 58–59, 63. While Plaintiff does turn his head to face Officer Billinghurst and continually offers verbal insults, *see* Humason Bodycam, 4:55–5:10, such acts are typically found to be mere passive resistance which do not justify the use of substantial force, particularly where a suspect is already restrained with handcuffs, *see Shumate*, 44 F.4th at 448; *Wells*, 538 F. App'x at 638. Especially given the low light and the dark clothing worn by both Plaintiff and the TPD Officers, it is simply not possible to tell from the video whether

Plaintiff is leaning back against Officer Billinghurst, or otherwise intentionally resisting her efforts through use of his body weight.

The same is true with respect to Plaintiff's alleged resistance after Defendant assists in escorting him to another police vehicle. Again, Defendant's participation in the disputed events is relatively short-lived, as no more than five seconds elapse between when Defendant and Officer Billinghurst begin to jointly escort Plaintiff and when Defendant effectuates the takedown maneuver. *See* Humason Bodycam, 5:18–:24. And the evidence as to what happened in these five seconds, including the bodycam footage, is equally consistent with a suspect who is continually pushing against and pulling away from the officers, *see* Defendant Dep., Doc. 31-2, at 50–51, one who spontaneously goes to the ground due to a potential combination of factors, *see* Billinghurst Dep., Doc. 31-4, at 25–26, or one who is pulled by two Officers moving at different speeds, intentionally tripped, and then "slammed" to the ground despite attempting to walk normally, *see* Plaintiff Dep., Doc. 31-1, at 28–29, 63.

With multiple viable counter narratives at play with respect to Plaintiff's alleged resistance, the question for the Court is whether a reasonable jury could believe Plaintiff's version of events and, if so, whether that version would constitute a violation of the Fourth Amendment. The answer is "yes" to both.

First, the video evidence does not blatantly contradict Plaintiff's admissible testimony regarding his actions while being escorted by Defendant and Officer Billinghurst. In *Scott v. Harris*, the Supreme Court found it proper to disregard the non-movant's assertion he "remained in control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns" where the videotape of his driving revealed he, in actuality, "rac[ed] down narrow, two-lane roads in the dead of night at speeds that are shockingly fast . . . cross[ed] the double-yellow line, and force[d] cars traveling in both directions to their respective shoulders to avoid being hit." 550

U.S. 372, 379 (2007) (quoting *Harris v. Coweta Cnty.*, 433 F.3d 807, 815–16 (11th Cir. 2005)). Accordingly, at the summary judgment stage, it is proper to disregard the Plaintiff's testimony describing the relevant events only where the video recording "blatantly contradicts" or "utterly discredit[s]" Plaintiff's version of events such that no reasonable juror would believe it. *Coble v. City of White House*, 634 F.3d 865, 868–69 (6th Cir. 2011) (quoting *Scott*, 550 U.S. at 380–81). Here, because the relevant bodycam footage is consistent with Defendant's and Plaintiff's versions of events, a jury could reasonably conclude either side's version of events comports with the truth after the full benefit of live, in-person testimony. *Cf. Anderson*, 477 U.S. at 255.

Further, viewing the evidence in a light most favorable to Plaintiff and drawing all reasonable, permissible inferences in Plaintiff's favor, *see Scott*, 550 U.S. at 381 n.8, the record is "sufficient to establish a violation of [his] Fourth Amendment right to be free from excessive force," *Meirthew v. Amore*, 417 F. App'x 494, 498 (6th Cir. 2011). To recap, the first *Graham* factor, if the jury reasonably determines Plaintiff was not resisting, points in his favor. The nexus between the purported severity of the offense being investigated and Defendant's takedown of Plaintiff is the need "to get [Plaintiff] into the patrol car and return to their investigation as soon as possible." (Doc. 33, at 8–9). If Plaintiff was not resisting, however, then effectuating a takedown would only delay his placement into the patrol car and effectively undermine Defendant's stated justification for the use of force. The second *Graham* factor indisputably weighs in Plaintiff's favor, as intoxication does not provide a valid basis for believing Plaintiff presents a danger to officers or the public once he is in handcuffs and secured on both sides by an officer. *Stanfield*, 727 F. App'x at 846. Finally, if a jury finds Plaintiff did not actively resist, the third factor would similarly weigh in his favor.

With all three enumerated *Graham* factors weighing in Plaintiff's favor when viewing the facts in a light most favorable to him, Defendant offers no other sufficient basis on which the Court

could find his use of force objectively reasonable as a matter of law. The case law Defendant relies on in his briefing is either derived from contexts entirely different than those present here or otherwise meaningfully distinguishable from present circumstances. For example, three of the cases Defendant points the Court to involve prison inmates who were not handcuffed and were found, including through the use of video footage, to have actively resisted the officers. *See* Doc. 33, at 9–10 (first citing *Griffin v. Hardrick*, 604 F.3d 949, 955 (6th Cir. 2010) (explaining the relevant videos showed the inmate was "clearly struggling" with officers as they attempted to restrain her); then citing *Martin v. Does*, 2017 WL 5614458, at *2 ("Once Plaintiff was on the ground, the officers attempted to handcuff him, but Plaintiff was holding his hands underneath himself. . . . After seeing the resistance Plaintiff was showing towards [the corrections officers] . . . he warned Plaintiff that he would deploy his taser, unless Plaintiff ceased resisting."); and then citing *Mitchell v. Monroe Cnty.*, 2017 WL 2403574, at *7 (expressly determining the Plaintiff, a pretrial detainee, engaged in "active resistance" by "resisting Defendants' efforts to lead him to the shower room" attempting to "break away from Defendants")).

Thus, the Court is persuaded, viewing the evidence in a light most favorable to Plaintiff, that a reasonable jury could believe Plaintiff's version of events, find he did not actively resist TPD Officers in their attempts to escort him away from the scene, and determine Defendant's use of force to be objectively unreasonable in violation of his Fourth Amendment rights. The sole remaining question, then, is whether such right was clearly established at the time of its violation. *See Saucier*, 533 U.S. at 201.

<u>Qualified Immunity</u>

Where, as here, the defendant raises qualified immunity at the summary judgment stage, the burden is on the plaintiff to point to binding case law clearly establishing his constitutional right he claims the defendant violated. For all but the most obvious of constitutional violations,

the plaintiff must identify case law "that places the constitutional question beyond debate. *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022). While the facts of the identified cases need not be identical to the case before the Court, they must be meaningfully similar such that it would "bind a panel of [the Sixth Circuit]." *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022).[8] The material facts of the cited cases "must be similar enough that [they] 'squarely govern[]'" the one before the Court. *Studdard v. Shelby Cnty.*, 934 F.3d 478, 481 (6th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

As expounded upon above, under the Fourth Amendment test for excessive force, the "operative question is whether the force used was '"objectively reasonable" in light of the facts and circumstances confronting' the officer." *Mosier*, 90 F.4th at 546 (quoting *Graham*, 490 U.S. at 397). Thus, to overcome the assertion of qualified immunity on his Fourth Amendment claim, Plaintiff must point to cases placing the question of whether the Officer Defendants' use of force was "objectively reasonable" beyond debate. *Id.* "'[S]pecificity is especially important' in Fourth Amendment excessive-force cases, where the constitutional boundaries are intensely fact-dependent." *Id.* (alteration in original) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam)).

Here, Plaintiff meets his burden. As Plaintiff identifies, this Court has itself noted: "[A] suspect's right to be free from force once incapacitated or neutralized is clearly established." (Doc. 36, at 21) (quoting *Abdoo v. Sheriff*, 2021 WL 877751, at *9 (N.D. Ohio)); *accord Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."); *Shumate*, 44 F.4th

---

8. Because only published opinions bind future panels, Plaintiff may not rely on unpublished Circuit court or any district court opinions to establish the contours of the clearly established right violated by the Officer Defendants. *Bell*, 37 F.4th at 368.

at 450 ("By 2019 . . . the right to be free from physical force when one is not actively resisting the police was clearly established."); *Meadows v. City of Walker*, 46 F.4th 416, 422 (6th Cir. 2022) ("We have repeatedly stated that '[d]rawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a claim pursued under § 1983.'") (quoting *Coffey v. Carroll*, 933 F.3d 577, 589 (6th Cir. 2019)); *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011) (finding it clearly established that "it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented" and denying qualified immunity where the officer "utilized a takedown maneuver that forcefully thrust [the plaintiff] to the breaking room floor. This maneuver was performed, despite the fact that plaintiff was handcuffed, leaving her with no means with which to protect her face.").

Plaintiff invokes multiple of the aforementioned precedents. Much like in *Meirthew*, if a jury believes Plaintiff's version of events and finds he offered only passive resistance, as they could reasonably determine based on the evidence, then Defendant's intentional takedown maneuver on Plaintiff while the latter wore handcuffs and had "no means with which to protect [his] face" would violate Plaintiff's clearly established rights under the Fourth Amendment. *Id.* at 499. Resolving the disputed facts in Plaintiff's favor would be sufficient to remove this case from the "zone of twilight" in which Defendant would be granted deference. *Feagin*, 155 F.4th at 604.[9] Thus, because Plaintiff has met his burden to demonstrate a genuine issue of material fact regarding Defendant's violation of his clearly established rights,[10] the Court denies Defendant's Motion for Summary Judgment.

---

9. That is, were a jury to believe Plaintiff's version of events, then the sole resistance he offered is general verbal insults and turning his head to face officers as they escorted him. As recounted above, such resistance is clearly established as merely passive. In this sense, "the exact nature of the threat or degree of resistance" would be anything but "unclear." *Feagin*, 155 F.4th at 604.

10. The Court reaches this conclusion without reliance on Plaintiff's proffered expert testimony. *See* Doc. 36-2, at 24 (opining "that the response to force in the form of a takedown against

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 33) be, and the same hereby is, DENIED.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 21, 2026

[Plaintiff] by [Defendant] was unnecessary and not in line with best police practices"). The presence of reasonable alternatives which might render one particular use of force unnecessary or against best practices is generally irrelevant to the Fourth Amendment excessive force inquiry, particularly once qualified immunity is raised as a defense. *See Roell*, 870 F.3d at 486 ("And so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." (citation modified) (quoting *Sheehan v. City of San Francisco*, 575 U.S. 600, 615 (2015))).